## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|      ) | |
| **Plaintiff,**      ) | |
|      ) | |
| **v.**      ) | |
|      ) | **Civil Action No. 25-cv-3771** |
| **APPROXIMATELY 1,159,834.52 USDT,**      ) | |
|      ) | |
|      ) | |
|      ) | |
| **Defendant.**      ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 1,159,834.52 USDT,[1] hereinafter the "Defendant Property," and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

2.      Venue is proper here under 18 U.S.C. § 3238 because the evidence to date has established the criminal offenses under investigation were begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238.

---

[1] As explained below, USDT is a type of virtual currency called a stablecoin. USDT is "stable" because its price is pegged to the price of the U.S. dollar, meaning one USDT is generally equivalent to $1. USDT is issued by a company called Tether.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

3.      The United States files this *in rem* forfeiture action to seek forfeiture of the Defendant Property involved in, and constituting the proceeds of, violations of wire fraud, wire fraud conspiracy, money laundering, money laundering conspiracy, and computer fraud in violation of 18 U.S.C. §§ 371, 1030, 1343, 1349, and 1956.

4.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

5.      Title 18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960, or any property traceable to such property.

6.      Title 18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to, *inter alia*, any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense. A violation of 18 U.S.C. §§ 1030 (computer fraud) or 1343 (wire fraud), or conspiracy to commit those offenses, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

7.      Title 18 U.S.C. § 1030(a)(2) makes it a crime, *inter alia*, to intentionally access a computer without authorization and thereby obtain information from any protected computer. 18 U.S.C. § 1030(a)(4) makes it a crime, *inter alia*, to knowingly and with intent to defraud, access a protected computer without authorization, and by means of such conduct further the intended fraud and obtain anything of value. The term "protected computer" is defined in 18 U.S.C. § 1030(e)(2) and includes, *inter alia*, a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States

that is used in a manner that affects interstate or foreign commerce or communication of the United States. *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (definition of protected computer under 18 U.S.C. § 1030(e)(2)(B) includes "at a minimum . . . all computers that connect to the Internet").

8.       Title 18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

9.       Title 18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

10.      Title 18 U.S.C. § 1956(a)(1)(A)(i) provides in relevant part that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—with the intent to promote the carrying on of specified unlawful activity" is guilty promotional money laundering.

11.      Title 18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that "whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source,

the ownership, or the control of the proceeds of specified unlawful activity" is guilty concealment money laundering.

12.    Title 18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

13.    The Defendant Property is virtual currency that the Federal Bureau of Investigation ("FBI") lawfully seized pursuant to case number 25-sz-15 and then transferred to the custody of the United States Marshals Service ("USMS"). As explained herein, the Defendant Property consists of USDT, a stablecoin issued by the company Tether. Tether controls the computer code that creates/mints USDT tokens. Because Tether controls that computer code, it can freeze USDT tokens associated with particular types of virtual currency addresses. In this case, Tether responded to a request from U.S. law enforcement by freezing the USDT associated with the virtual currency addresses listed in the chart below. Then, after receiving seizure warrant 25-sz-15, Tether destroyed the USDT associated with those addresses and reissued an equivalent amount of the USDT to the U.S. government. That reissued USDT is the Defendant Property.

| Name | Virtual Currency Address | Approximate Amount (USDT) |
|------|--------------------------|---------------------------|
| **Target Address 1** | TCPKG3NqPH9hKUGDUP7o3sPp3X5xGeVcbu | 2,811.68460942762 |
| **Target Address 2** | TBS5WjmCRcahTCKBbT8MkDdNV9pbUr3rRS | 46,598.40785518450 |
| **Target Address 3** | TQv6uUTfe67x47sAQgFabyEh3hmuZunDSc | 28,496.2494150251 |
| **Target Address 4** | TCWHP82YTVw3eRQwzq4NE1pXVLKd912KEM | 55,862.488939575 |
| **Target Address 5** | TMwrQxEAW2nStP4ZfdTr5CN51aq8HcpW8S | 48,221.4220607076 |
| **Target Address 6** | TXY9zwYPKUMf8G5vHwxHywtj85W1PG4ahr | 96,513.8447428521 |
| **Target Address 7** | TTF5Czy24QEUJYsqoU6T3FMRQjEWaAVJhH | 55,200.4831453321 |
| **Target Address 8** | TDeZCUfNWYhzxqn21tkc2TuzSHHWaWj9Mq | 79,391.6948802729 |

| | | |
|---|---|---|
| **Target Address 9** | TB6W5UCxfWkLYyh9tryThFDUhNAHXccfVo | 68,271.5975509958 |
| **Target Address 10** | TCCxhh6rwG7Zwb8Xyv8DUCRjgP7LV7tx7y | 60,951.5334817235 |
| **Target Address 11** | TXogG8Yqog8wRfcE94wSofUFcBax3hSGuG | 4,712.04124240589 |
| **Target Address 12** | TRadqVTveKB1MNarRsjRGdLqmwCjv2QbAB | 55,430.4851584377 |
| **Target Address 13** | TT6RhFnGEzRQTk86dB8YQNr763Lau8Qkj4 | 304,804.6678199910 |
| **Target Address 14** | TVYvJJ4MwSPfWBRjVcz8nkUzDMyiZpxYZE | 22,648.1982296283 |
| **Target Address 15** | TNhb762fcw6S6H7hrdVrVgnWu5hMvv93qQ | 16,186.1416701150 |
| **Target Address 16** | TSFhnjJAwiN5tUSHvYrUw8B4deoX3EhCwK | 16,266.1423703256 |
| **Target Address 17** | 0x56db0FE0b35584Bd94542417F578ED8b79d099a7 | 132,416.966394856 |
| **Target Address 18** | 0x4c817BfBc703eff688b3FA39Ef626627b6460b03 | 65,050.4747461439 |
| | **TOTAL:** | **1,159,834.52** |

## STATEMENT OF FACTS

14.    The FBI is investigating numerous virtual currency heists perpetrated by members of North Korean military hacking groups, known within the cybersecurity community as both the Lazarus Group and APT38.[2] Since at least late-2014, the subjects have targeted banks and virtual currency exchanges, including banks and virtual currency exchanges located in the U.S., and have successfully initiated fraudulent transfers at both. From at least 2017 through 2025, the North Korean subjects have continued this targeting, and successfully conducted multiple virtual currency heists, netting hundreds of millions of dollars of virtual currency. For example, in or around August 2021, North Korean cyber actors stole approximately $90 million in virtual currency from Japan-based virtual currency exchange Liquid. Then, in or around March 2022, North Korean cyber actors stole approximately $615 million in virtual currency from foreign-based Sky Mavis. In or around June 2022, North Korean cyber actors stole approximately $105 million in virtual currency from

---

[2] APT or "Advanced Persistent Threat" is a term used to define and identify groups of organized, highly skilled, and well-resourced cyber actors who maintain focused efforts on specific tasks such as intelligence gathering against specific business sectors or governments. APTs are known to gain access to computer networks while remaining undetected for extended periods. APTs are often nation-state or state-sponsored groups. Upon identification, the group is assigned a unique number as an identifier by the community: in this case, the cybersecurity community has dubbed this group of North Korean cyber actors as "APT38."

U.S.-based Harmony. Then, in or around July 2023, North Korean cyber actors stole approximately $37 million in virtual currency from CoinsPaid, an Estonian company, and approximately $101 million from Alphapo, a Panamanian company. Additionally, on or about November 10, 2023, North Korean cyber actors stole approximately $138 million from Panama-based virtual currency exchange Poloniex. The North Korean hackers who stole virtual currency from Liquid, Sky Mavis, Harmony, CoinsPaid, Alphapo, and Poloniex are part of an ongoing conspiracy, and have regularly used U.S.-based computer infrastructure to facilitate intrusions that are part of these virtual currency heists.

15.    The FBI assesses that Lazarus Group/APT38 actors are responsible for these hacks based on, among other things, distinctive tactics, techniques, and procedures observed in other virtual currency heists linked to North Korea. These subjects have engaged in cyber-attacks, intrusions, and attempted intrusions into computers and networks of, among others, U.S. and foreign entertainment companies, U.S. and foreign banks, U.S. cleared defense contractors and energy companies, virtual currency exchanges, information security researchers, and pharmaceutical companies. These North Korean subjects have exhibited a particular focus on leveraging their malicious cyber activity to steal money and virtual currency from their victims.

15.    The Defendant Property is traceable to the CoinsPaid, Alphapo, and Poloniex heists referenced above.

16.    The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, to promote and enhance cooperation among law enforcement agencies, and most

importantly: to recover assets that may be used to compensate victims through the remission process.[3]

I.    **Background Related to Virtual Currency**

17.    **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies operate on different blockchains, and there are many different, widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain, and ETH exists on the Ethereum network. Typically, a virtual currency that is "native" to a particular blockchain cannot be used on a different blockchain. Thus, absent technological solutions those native assets are siloed within a specific blockchain. For instance, ETH (the native token on the Ethereum network) cannot be used on other networks unless it is "wrapped" by smart contract code. This wrapping process results in what is called Wrapped ETH or WETH.

18.    **Stablecoins**: As mentioned above, stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralizations (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

19.    **Tether (USDT)**: Tether is a company that manages the smart contracts (which are defined below) and the treasury (*i.e.,* the funds held in reserve) for USDT, a stablecoin pegged to the

---

[3] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

U.S. dollar. As previously stated, Tether can update its smart contracts to freeze USDT associated with particular virtual currency addresses.

20.    **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

21.    **Private Key**: Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

22.    **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of the instant complaint are software wallets (*i.e.,* a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time. Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

23.    **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and

maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

24.    **Blockchain Explorer**: These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[4] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

25.    **Smart Contracts**: Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome, without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

26.    **Virtual Currency Bridge**: A blockchain bridge, otherwise known as a cross-chain bridge, connects two blockchains and allows users to send virtual currency from one chain to the other—for example, from the Bitcoin blockchain to the Ethereum network.

27.    **Virtual Currency Exchanges (VCEs)**: VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. There are generally two types of VCEs: centralized exchanges and decentralized exchanges, which are also known as "DEXs." Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence on their

---

[4] API stands for "application programming interface," which is a set of definitions and protocols for building and integrating application software.

customers (*i.e.*, know-your-customer checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

28.    **Virtual Currency Mixers**: Virtual currency mixers (also known as tumblers or mixing services) are software services that allow users, for a fee, to send virtual currency to designated recipients in a manner designed to conceal and obfuscate the source of the virtual currency. Based on my training and experience, I know that virtual currency mixers are a common laundering tool used by North Korean cyber actors and their money laundering co-conspirators. As described below, Sinbad.io ("Sinbad") is one of the virtual currency mixers that the actors used to launder the proceeds of their heists. On or about November 29, 2023, the U.S. Treasury Department's Office of Foreign Assets Control sanctioned Sinbad, in part because it had been used to launder millions of dollars' worth of virtual currency from Lazarus Group heists, including the CoinsPaid and Poloniex heists mentioned above.

29.    **Blockchain Analysis**: As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can often identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a 'cluster'). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open-source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

30.    In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate

virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

## II.    Tracing the Defendant Property to the Alphapo, CoinsPaid, and Poloniex Heists

### Overview of Money Laundering Stages 1-3

31.    As discussed above, on or about July 22, 2023, North Korean hackers stole approximately $101 million in virtual currency from Alphapo and approximately $37 million in virtual currency from CoinsPaid. The hackers (and/or their money laundering co-conspirators)[5] then laundered the proceeds through virtual currency bridges, several BTC addresses, and virtual currency mixers before consolidating the funds and depositing them at different exchanges. This laundering occurred in three general stages.

a.    Stage 1 involved the initial theft from Alphapo and CoinsPaid and transfers through virtual currency bridges, which converted the stolen virtual assets to BTC.

b.    Stage 2 involved moving the BTC through the Sinbad mixing service and then to multiple virtual currency wallet addresses to include, as relevant to this Complaint, a particular cluster of BTC addresses: bc1pttac8lmptya5sal3djc4lsjujvt73fganctj53yglsqw69v036dqxruqnm and bc1pnnhh3gkyvn4fth97x2j6tyd9p7mduz0sdl2vayn8g0yqqmuhxzzs9638ty    (the    "Consolidation Cluster").

c.    Stage 3 involved transfers from the Consolidation Cluster through virtual currency bridges, where the hackers converted the proceeds into stablecoins like USDT.

---

[5] Throughout this affidavit, references to "hackers" and/or "actors" conducting financial transactions should be read as "North Korean cyber actors and/or their money laundering co-conspirators" engaging in money laundering and/or other criminal activity.

32.     As discussed above, on or about November 10, 2023, North Korean hackers stole approximately $138 million in virtual currency from Poloniex. The hackers then laundered the stolen funds through a pattern similar to the one used for laundering funds stolen from Alphapo and CoinsPaid. The actors initially laundered the stolen Poloniex funds through bridges, as with stolen Alphapo and CoinsPaid funds, but they converted funds to ETH (rather than BTC). Next, the actors moved the Poloniex proceeds through the Tornado Cash mixing service (rather than Sinbad), converted the ETH to BTC, and, notably, into the same Consolidation Cluster. Stage 3 similarly involved transfers from the Consolidation Cluster, through virtually currency bridges, and eventual conversion of proceeds into stablecoins like USDT.

33.     Law enforcement  traced funds from the Consolidation Cluster—which processed funds from all three heists—to additional addresses and, ultimately, to **Target Addresses 1–18**, comprising the Defendant Property.

34.     The paragraphs below describe in more detail the laundering of proceeds from the three heists and the tracing of those proceeds and other actor funds to the Defendant Property.

**Tracing Funds from Alphapo and CoinsPaid to the Consolidation Cluster**

A.     *Stage 1: Use of Virtual Currency Exchanges and Bridges to Convert Stolen Funds to BTC*

35.     From Alphapo, the North Korean hackers stole approximately 2,464.3 ETH, along with other ERC-20 tokens, including USDT. Using an exchange, "Exchange-1," the hackers converted the stolen ERC-20 tokens, within the same wallet address. After converting the stolen ERC-20 tokens into ETH, the total amount of ETH within the wallet address was 5,742 ETH. The hackers then sent the funds to approximately 61 separate ETH addresses and then to a cryptocurrency bridge, "Bridge-1," where they converted the ETH to BTC.

36.     From CoinsPaid, the North Korean hackers stole approximately 1,186.9 ETH, along

with other ERC-20 tokens, including USDT. Using Exchange-1, the hackers converted the stolen ERC-20 tokens into ETH, leaving the hackers with approximately 6,673 ETH. The hackers then sent around 6,698.9 ETH to approximately 76 separate ETH addresses and then to Bridge-1, where they converted the ETH to BTC.

B.     *Stage 2: Use of Virtual Currency Mixers to Obfuscate Transactions Involving Stolen Funds*

37.     Once the actors had the stolen funds on the BTC blockchain, they sent the BTC through Sinbad, a virtual currency mixing service, to obfuscate the source of the funds.[6]

38.     Law enforcement traced the stolen funds through Sinbad and identified around 298 BTC (approximately 39 BTC of which was directly traceable to the Alphapo and CoinsPaid heists) that came out of Sinbad to an address controlled by the hackers in July 2023. After several more transfers, the hackers sent around 295.6 BTC (worth approximately $19,514,866 at the time of the transfers) to the Consolidation Cluster in June 2024.

### Tracing Funds from Poloniex to the Consolidation Cluster

39.     From Poloniex, the North Korean hackers stole approximately $138 million in virtual currency. All the stolen cryptocurrency was deposited into hacker-controlled wallet, including, among others, one BTC address, one ETH address, and one TRX address.[7] Like the Alphapo and CoinsPaid heists, the actors used swapping services, primarily Exchange-1, to convert the tokens into another asset—which was ETH in the case of the Poloniex heist. The hackers then controlled

---

[6] Sinbad allows a customer to pick the number of output addresses (up to eight) to which the customer wants the mixed funds deposited. Sinbad also allows up to seven days for the customer to withdraw the funds from the mixer, and the fee ranges from 0.5% to 2.5%. Sinbad typically utilized only bech32 addresses (*i.e.*, BTC addresses beginning with bc1q), along with three or four outputs in a transaction.

[7] TRON (TRX) is a blockchain-based operating system developed by the Tron Foundation and launched in 2017.

around 25,997 ETH across numerous ETH addresses, all of which was traceable to the Poloniex heist.

40.    In May 2024, the hackers conducted hundreds of transactions, moving a total of approximately 26,063 ETH through Tornado Cash, another virtual currency mixing service, a service that was favored by North Korean hackers and/or their money laundering co-conspirators.[8]

41.    Law enforcement traced the stolen funds out of Tornado Cash and into 88 separate ETH addresses. In May 2024, the hackers consolidated the funds into 14 separate ETH addresses, which held approximately 18,240 ETH, all of which was traceable to the Poloniex heist. The hackers further consolidated the funds and sent them through a cryptocurrency bridge, "Bridge-2," where they converted the ETH to BTC. The hackers then sent approximately 777 BTC to three unhosted BTC addresses.

42.     In May 2024, the hackers made dozens of withdrawals from these BTC addresses. Four of those transactions sent a total of approximately 55 BTC to four separate BTC addresses. Those four addresses transferred their balances to three other BTC addresses. In June 2024, the hackers transferred approximately 50 BTC from these three addresses to a single address, which in turn transferred its entire balance to the Consolidation Cluster less than one hour later.

**Tracing Funds from the Consolidation Cluster to the Defendant Property**

43.    After the actors moved the funds stolen from Alphapo, CoinsPaid, and Poloniex into the Consolidation Cluster as BTC, they split the BTC into smaller amounts and laundered the funds through a variety of bridge services, ultimately converting the BTC to USDT. The actors then

---

[8] To make a deposit into Tornado Cash, the user must choose a deposit amount of 0.1, 1, 10, or 100. For deposits of 100 virtual assets, the withdrawal amount can be expected to be approximately 99.5 with 0.5 paid as a fee to the mixing service.

transferred the USDT to the eighteen addresses that held the Defendant Property (*i.e.*, the USDT associated with Target Addresses 1-18).

44.    **Target Addresses 1, 2, and 3**: From June 15, 2024, to June 17, 2024, the hackers transferred around 22 BTC from the Consolidation Cluster into 22 separate unhosted BTC addresses. Those addresses sent funds through Bridge-2—where the actors converted the BTC to ETH and USDT on the Ethereum network—and to three ETH addresses. The actors then sent the assets from these three addresses through another cryptocurrency bridge, "Bridge-3," to convert the ETH and USDT to approximately 1,499,000 USDT on the Tron Network in the form of USDT TRX. The actors sent the USDT TRX to multiple addresses, including one that received approximately 349,486 USDT TRX (at least 329,293 of which was traceable to the Alphapo, CoinsPaid, and Poloniex heists). From that address, the actors sent approximately 107,039 USDT TRX to **Target Address 1** (of which approximately 106,847 was traceable to the heists) and sent approximately 240,000 USDT TRX to **Target Address 3** (of which approximately 220,000 was traceable to the heists). Next, **Target Address 1** sent approximately 140,000 USDT TRX to **Target Address 2**; roughly five hours later, **Target Address 2** sent approximately 204,500 USDT TRX to **Target Address 3**. As of June 23, 2024, these addresses had the following balances: **Target Address 1** held 2,811.68460942762 USDT TRX, the entirety of this balance is traceable to the heists; **Target Address 2** held 46,598.40785518450 USDT TRX, the entirety of this balance is traceable to the heists; and **Target Address 3** had 28,496.2494150251 USDT TRX. In total, **Target Address 3** received 915,898.2494150251 USDT TRX, approximately 831,382.2494150251 of which was traceable to

the heists. The FBI has not yet been able to determine the source of the remaining 84,516 USDT TRX.[9]

45.    **Target Addresses 4, 5, 6, 7, and 8**: On or about June 18, 2024, the hackers transferred approximately 290,037 USDT TRX from three TRX addresses—which also processed funds that ended up in **Target Address 1, 2,** and **3**—into a new TRX address. All but around 6,177 of the USDT TRX was traceable to the heists. The same day, the actors transferred approximately 290,037 USDT TRX through additional addresses, including an address to which the actors deposited approximately 47,403 USDT TRX of unknown origin. The actors then sent the entire balance of that address (around 337,440 USDT TRX) through Bridge-3, where they converted the USDT TRX into USDT on the Ethereum blockchain. Less than two hours later, the actors sent the funds back through Bridge-3 to convert the USDT ETH back to USDT TRX. From Bridge-3, the actors initiated the following transfers: approximately 55,977 USDT TRX to **Target Address 4**; approximately 48,221.4220607076 USDT TRX to **Target Address 5**; approximately 96,513.8447428521 USDT TRX to **Target Address 6**; approximately 55,200.4831453321 USDT TRX to **Target Address 7**; and approximately 79,391.6948802729 USDT TRX to **Target Address 8**. As of June 18, 2024, these addresses maintained their entire balances, except for **Target Address 4**, which held a balance of 55,862.488939575 USDT TRX because approximately 115 USDT TRX was transferred out before Tether enacted the freeze.

46.    **Target Addresses 9 and 10**: On June 17, 2024, the hackers transferred 2 BTC from the Consolidation Cluster to another BTC address, where they split the funds. The actors sent approximately 0.4998 BTC through several other addresses, then through Bridge-2 (where they

---

[9] The threat actors were able to withdraw some of the USDT TRX associated with these addresses before Tether froze the addresses on or about September 20, 2024, which is reflected in the difference between what was transferred into these addresses and what was frozen by Tether.

converted the BTC to USDT ETH), and through Bridge-3 (converting USDT ETH to USDT TRX), eventually depositing around 32,279 USDT TRX in a TRX address. The actors also sent approximately 0.4996 BTC through Bridge-2—where they converted the BTC to USDT ETH, and then to USDT TRX—depositing approximately 32,449 USDT TRX to another address. The actors transferred these two balances of USDT TRX to **Target Address 9**. On June 17, 2024, the actors transferred approximately 128,000 USDT TRX from **Target Address 9** to **Target Address 10**.[10] In total, **Target Address 9** received approximately 196,271 USDT TRX and then maintained a balance of approximately 68,271.5975509958 USDT TRX after transferring funds to **Target Address 10**. In total, **Target Address 10** received a total of approximately 745,925 USDT TRX[11] and maintained a balance of approximately 60,951.5334817235 USDT TRX.[12]

47.    **Target Address 11**: On June 16, 2024, the hackers withdrew approximately 2 BTC from the Consolidation Cluster and deposited the funds to the Threshold Network, where they converted 2 BTC to 2 TBTC,[13] allowing them to bridge the BTC to the Ethereum network. From the address holding the 2 TBTC, the actors transferred 1 TBTC through Exchange-1, where they converted it to approximately 66,032 USDT. The actors sent the other 1 TBTC to another address and then to Exchange-1, where they converted it to approximately 66,035 USDT. The actors sent these USDT balances through another cryptocurrency bridge, "Bridge-4," where they converted the

---

[10] Also on June 17, 2024, **Target Address 10** received approximately 64,000 USDT TRX from an address that also sent funds to **Target Address 3**.

[11] **Target Address 10** also received 96,000 USDT TRX from two other wallet addresses associated with North Korean laundering activity, but unrelated to the Alphapo, CoinsPaid, and Poloniex heists.

[12] **Target Address 10** also sent approximately 30 TRX (worth approximately $3.57 at the time of the transfer) to **Target Address 8**.

[13] The Threshold Network is an autonomous network that operates the wrapped token, TBTC.

USDT to USDT TRX, and then to approximately four addresses. Those addresses transferred their balances, totaling approximately 131,628 USDT TRX, to **Target Address 11**. In total, **Target Address 11** received approximately 132,712 USDT TRX; however, the hackers withdrew approximately 128,000 USDT TRX before Tether froze the address, leaving a balance of approximately 4,712.04124240589 USDT TRX.[14]

48.    **Target Address 12**: Like with **Target Address 11**, on June 16, 2024, the North Korean actors withdrew approximately 2 BTC from the Consolidation Cluster and deposited the funds to the Threshold Network, where they converted 2 BTC to 2 TBTC, which bridged the BTC to the Ethereum network. The actors sent the 2 TBTC through Exchange-1, where they converted it to approximately 131,624 USDT, and then sent the funds through Bridge-3, where they converted the USDT to USDT TRX. After Bridge-3, the actors held approximately 131,227 USDT TRX at an address. Separately on June 16, 2024, the North Korean actors withdrew 3 BTC from the Consolidation Cluster, deposited it to the Threshold Network (converting BTC to TBTC), converted the TBTC to approximately 197,401 USDT, and then sent the funds through Bridge-3 (converting approximately 196,807 USDT to USDT TRX) and ultimately to the same address that received the approximately 131,624 USDT TRX that was converted from 2 BTC earlier in the day. From that address, on June 17, 2024, the actors sent approximately 70,700 USDT TRX to **Target Address 12**. In total, **Target Address 12** received approximately 113,806 USDT TRX, approximately 70,000 (61%) of which was traceable to the heists. However, the hackers withdrew approximately 58,376 USDT TRX before Tether froze the address, leaving **Target Address 12** with a balance of

---

[14] After that withdrawal, **Target Address 11** received 1,082 USDT TRX from addresses whose source of funds has not been determined. Accordingly, around 3,630 USDT TRX—or roughly 77%—of the balance of **Target Address 11** was traceable to the Alphapo, CoinsPaid, and Poloniex heists.

approximately 55,430.4851584377 USDT TRX, at least 52,973 (approximately 95%) of which was traceable to the heists.

49.     **Target Addresses 13 and 14**: On June 16, 2024, the hackers withdrew approximately 10 BTC from the Consolidation Cluster and sent it to another BTC address, where they split the funds.

a.     On June 16, 2024, the actors sent 1 BTC to each of two addresses (2 BTC total), then through Bridge-2, where they converted the BTC to USDT on the Binance Smart Chain ("USDT BNB"). The actors consolidated the USDT BNB in an address, then sent approximately 65,892 USDT BNB through Bridge-3, where it was converted to approximately 65,962 USDT TRX and then sent to another address (the "SAr2U Address"). The actors sent the remaining 65,959 USDT BNB through Bridge-3 (converting it to USDT TRX) and deposited 65,759 USDT TRX to the SAr2U Address (which had received the previous deposit of USDT TRX after Bridge-3). The SAr2U Address separately received approximately 197,731 USDT TRX from Bridge-3, which converted the stablecoin DAI on the Ethereum network to USDT TRX. That balance of DAI came from three transfers out of Bridge-2, which came from a sending address that was part of the Consolidation Cluster.

i.     On June 16, 2024, the SAr2U Address  sent approximately 26,214 USDT TRX to **Target Address 14**.

ii.     On June 17, 2024, the SAr2U Address sent approximately 300,000 USDT TRX to **Target Address 13**. Roughly one hour later, the actors sent approximately 184,542 USDT TRX from **Target Address 13** back to the sending address.

b.     On June 16, 2024, the actors sent approximately 5.50 BTC from the Consolidation Cluster to another address and then converted approximately 2.2 BTC to

approximately 40.6249 ETH. The actors then sent around 20.3 ETH to one address and 20.324 ETH to another. Next, the actors sent the balances of both ETH addresses through Tornado Cash. Law enforcement traced theses funds through Tornado Cash to another cryptocurrency bridge, "Bridge-5," where the actors converted the ETH to USDT TRX. The actors consolidated approximately 142,460 USDT TRX at an address and then sent the entire balance to **Target Address 13**.

        c.     On June 17, 2024, the actors sent approximately 10 BTC from the Consolidation Cluster to an address from which the actors split the funds. In one set of transactions, the actors sent 1.999 BTC to an address, which in turn sent 1 BTC to an address that had also received 1 BTC a day earlier.[15] From there, the actors sent approximately 1 BTC through Bridge-2, converting it to Wrapped BTC on Ethereum. The actors converted the Wrapped BTC to approximately 65,235 USDT, which they sent through Bridge-5 to convert it to USDT TRX. The actors sent the USDT TRX to another address, and then on June 17, 2024, sent approximately 34,803 USDT TRX to **Target Address 14**.

        d.     In total, **Target Address 13** received approximately 4,489,344 USDT TRX and maintained a balance of approximately 304,804.6678199910 USDT TRX, because most of its funds were withdrawn before Tether was able to freeze the USDT TRX associated with the address. **Target Address 13** actively conducted transactions from June 11, 2024, to June 17, 2024, and most of its funds came from unknown sources. However, its four most recent deposits totaled approximately 457,930 USDT TRX, of which 442,260 (96%) was traceable to the heists.

---

[15] The deposit of 1 BTC from the previous day came from an address that had received 5 BTC from the Consolidation Cluster, as described at the beginning of paragraph 49 (related to **Target Address 13 and 14**).

e.      In total, **Target Address 14** received approximately 62,274 USDT TRX and maintained a balance of approximately 22,648.1982296283 USDT TRX after pre-freeze withdrawals of approximately 39,626 USDT TRX. The entirety of this balance was traceable to the heists.

50.     **Target Address 15 and 16**: On June 17, 2024, the hackers sent approximately 0.5 BTC from the Consolidation Cluster to a BTC address. The actors sent 0.25 BTC directly to Bridge-2 and sent another 0.25 BTC through an intermediary address before sending through Bridge-2, where they converted the BTC to ETH. For one of the two addresses that sent BTC into Bridge-2, the actors transferred the balance (approximately 4.625 ETH) to another address and then converted the ETH to approximately 16,237 USDT at the same address. For the other address that sent BTC into Bridge-2, the actors transferred the balance (approximately 4.641 ETH) to another address and then converted the ETH to approximately 16,317 USDT. From the address holding 16,237 USDT, the actors sent the funds through Bridge-5, where they converted it to USDT TRX, and then deposited the USDT TRX to **Target Address 15**. Similarly, from the address holding 16,317 USDT, the actors sent the funds through Bridge-5, where they converted it to USDT TRX, and then deposited the USDT TRX to **Target Address 16**. In total, **Target Address 15** received approximately 16,186.1416701150 USDT TRX and **Target Address 16** received approximately 16,266.1423703256 USDT TRX. Both maintained their balances, which were traceable to the heists.

51.     **Target Address 17**: On June 17, 2024, the hackers sent approximately 9.965 BTC from the Consolidation Cluster to a BTC address. From there, the actors sent 4 BTC to another address and 2.999 BTC to another. From the address that received 2.999 BTC, the actors sent 1 BTC through Bridge-2, converting it to 0.991 Wrapped BTC on the Ethereum network, and then to an ETH address. From the address that received 4 BTC, the actors sent 1 BTC through Bridge-2, converting it to 0.994 Wrapped BTC on the Ethereum network, and deposited it at the same ETH

address that received 0.991 Wrapped BTC. The actors then sent 1.973 Wrapped BTC through an exchange, "Exchange-2," where they converted the funds to approximately 132,416.966394856 USDT, and then to **Target Address 17**. In total, **Target Address 17** maintained a balance of 132,416.966394856 USDT, all of which was traceable to the heists.

52.     **Target Address 18:** On June 17, 2024, the hackers sent approximately 1 BTC from the Consolidation Cluster to a BTC address and then to the Threshold Network, where it was converted to TBTC. The actors sent around 0.41 TBTC to an address, converted the TBTC to approximately 26,668 USDT, and transferred the USDT to **Target Address 18**. The actors sent the remaining 0.589 TBTC to another address, converted it to approximately 38,379 USDT, and transferred the USDT to **Target Address 18**. In total, **Target Address 18** received and maintained a balance of approximately 65,050.4747461439 USDT, all of which was traceable to the heists.

III.    **Seizure of the Defendant Property**

53.     On or about March 19, 2025, the FBI served a seizure warrant for the Defendant Property on Tether, which transferred to the United States the equivalent amount of USDT as was associated with **Target Addresses 1–18**.

54.     The Defendant Property is currently in the possession of the USMS.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. §§ 981(a)(1)(C) & 28 U.S.C. § 2461(c))

55.     Paragraphs 1 through 53 are realleged and incorporated by reference here.

56.     The Defendant Property is property constituting or derived from proceeds traceable to wire fraud, computer fraud, and conspiracy to commit wire fraud and computer fraud, in violation of 18 U.S.C. §§ 371, 1030, 1343, and 1349.

57.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. §§ 981(a)(1)(A))

58.    Paragraphs 1 through 53 are realleged and incorporated by reference here.

59.    The Defendant Property is property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(1)(B)(i), and 1956(h), that is, a conspiracy to conduct or attempt to conduct financial transactions involving the proceeds of specified unlawful activity, to wit, wire fraud, computer fraud, and conspiracy to commit these offenses, with the intent to promote the carrying on of specified unlawful activity, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

60.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## PRAYER FOR RELIEF

61.    WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

October 24, 2025
Washington, D.C.

Respectfully submitted,


JEANINE FERRIS PIRRO
United States Attorney
for the District of Columbia

*/s / Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765

Gregory Jon Nicosia, Jr.
D.C. Bar No. 1033923
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C.  20530
(202) 353-4273

Jessica C. Peck
N.Y. Bar No. 5188248
Trial Attorney
U.S. Department of Justice, Criminal Division
Computer Crime and Intellectual Property Section
1301 New York Avenue, N.W., Suite 600
Washington, D.C. 20005
(202) 514-1026 (main line)

## VERIFICATION

I, Jon Webb, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 22 day of October, 2025.

Jon Webb
Special Agent
Federal Bureau of Investigation