**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 25-CV-3771 |
| APPROXIMATELY 1,159,834.52 | ) |
| MILLION USDT, | ) JURY TRIAL DEMANDED |
| | ) |
| Defendant in rem, | ) |
| | ) |
| HAN KIM and YONG SEOK KIM, | ) |
| | ) |
| Claimants. | ) |
| | ) |

**MOTION FOR JUDGMENT ON THE PLEADINGS AND MEMORANDUM OF
POINTS AND AUTHORITIES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

I.    INTRODUCTION ...................................................................................1

II.   FACTS....................................................................................................2

      A.    Background on Blockchain Technology and Tether ..............................2

      B.    The Kims' Efforts to Recover For the Kidnapping, Torture, And
            Murder of Their Loved One ...................................................................4

      C.    North Korea Obtains Crypto Assets Through Fraud, Launders
            Them And Commingles Them With Assets From Other Sources,
            Then Sells Them For USDT....................................................................5

      D.    The Kims Establish an Execution Lien on The Defendant
            Property .................................................................................................6

      E.    This Proceeding.....................................................................................7

III.  ARGUMENT ..........................................................................................7

      A.    Legal Standards For Judgment on The Pleadings And Summary
            Judgment in Forfeiture Cases ................................................................8

      B.    The Kims' Claim Is Superior to The Government's Under *Levin
            II* ............................................................................................................9

            1.    The Kims hold a lien on the Defendant Property .........................9

            2.    The Defendant Property is "the blocked asset[] of [a]
                  terrorist party" subject to a terrorism-related judgment
                  and so, under Levin II, the Kims' claim defeats the
                  Government's ...............................................................................12

      C.    This Court Retains Jurisdiction to Direct The Defendant
            Property to The Kims After Dismissing The Government's Claim.......16

IV.   CONCLUSION....................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670 (1976) ................................10

*All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d
16 (2d Cir. 1999) ....................................................................................................10

*Don King Prods., Inc. v. Thomas*, 945 F.2d 529 (2d Cir. 1991).............................. 7, 10

*Est. of Levin v. Wells Fargo Bank, N.A. ("Levin I")*, 45 F.4th 416 (D.C.
Cir. 2022)..............................................................................................................11

*Estate of Levin v. Wells Fargo Bank, N.A. ("Levin II")*, 156 F.4th 632
(D.C. Cir. 2025) ...............................................................................................*passim*

*Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C. Cir. 2023).....................16

*Greenbaum v. Islamic Republic of Iran*, No. 21-CV-305 (D.D.C. Nov. 1,
2024) .....................................................................................................................16

*Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45 (D.D.C. 2009)........................9

*Kim v. Democratic People's Republic of Korea*, No. 09-CV-648 (D.D.C.
Apr. 8, 2009).............................................................................................................4

*Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29
(D.D.C. 2013)............................................................................................................4

*Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir.
2014) ............................................................................................................... 4, 5, 15

*Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286
(D.D.C. 2015)........................................................................................................1, 5

*Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016) ...................................14

*Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) ...............................14

*Koehler v. Bank of Bermuda Limited*, 12 N.Y.3d 533 (2009)....................................12

*Office Depot, Inc. v. Zuccarini*, 596 F.3d 696 (9th Cir. 2010).....................................11

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024) ...........................................12

*Timoria LLC v. Anis*, 346 A.3d 1166 (Del. Ch. 2025) ...............................................11

*United States v. $100,348 U.S. Currency*, 354 F.3d 1110 (9th Cir. 2004)......................9

*United States v. $148,840 in U.S. Currency*, 521 F.3d 1268 (10th Cir. 2008) ..........................................................................................................8

*United States v. 475 Martin Lane*, 545 F.3d 1134 (9th Cir. 2008) ...................... 7, 8, 17

*United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205 (D.D.C. 2011) ................................................................8

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607 (7th Cir. 2015) ..............................................................8

*United States v. One Lincoln Navigator*, 328 F.3d 1011 (8th Cir. 2003) ..................8, 9

*United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36 (1st Cir. 2003).........................................................................9

*United States v. Wilson*, 540 F.2d 1100 (D.C. Cir. 1976).............................................17

## STATUTES

18 U.S.C. § 371 ...............................................................................................................7

18 U.S.C. § 981 ...............................................................................................................9

18 U.S.C. § 1030 .............................................................................................................7

18 U.S.C. § 1343 .............................................................................................................7

18 U.S.C. § 1349 .............................................................................................................7

18 U.S.C. § 1956 .............................................................................................................7

28 U.S.C. § 1605A ................................................................................................... 13, 15

28 U.S.C. § 1610 ...........................................................................................................13

28 U.S.C. § 1610(c) .........................................................................................................5

28 U.S.C. § 1961 .............................................................................................................5

Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322 ...................13

TRIA § 201(d)(2)(A)–(B)...............................................................................................13

TRIA § 201(d)(4) ...........................................................................................................13

## RULES

Fed. R. Civ. P. 12(b)(6)..................................................................................8

Fed. R. Civ. P. 12(c)......................................................................................8

Fed. R. Crim. P. 41(e) ...............................................................................17

## REGULATIONS

31 C.F.R. § 594.201(a)...............................................................................14

## OTHER AUTHORITIES

David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 St. John's L. Rev. 43 (2009)........................... 7, 10

Office of Foreign Asset Control (OFAC), Specially Designated Nationals and Blocked Persons List (Oct. 2025) ......................................................14

U.S. Department of State, State Sponsors of Terrorism .............................................15

## I.    INTRODUCTION

This case is about what happens when the Government seeks to forfeit property that a state sponsor of terrorism possesses and that is also the proceeds of that state's non-terrorism crimes. Does the property go to the victims of terrorism or to the government?

The D.C. Circuit has squarely decided that the property goes to the victims of terrorism. In *Estate of Levin v. Wells Fargo Bank, N.A. ("Levin II")*, the Court held that, where a state sponsor of terrorism obtains property through crime and that property is "blocked" under the International Emergency Economic Powers Act, judgment creditors' liens from terrorism-related judgments defeat the Government's claim to forfeiture because the Terrorism Risk Insurance Act "subject[]s to execution" the blocked assets of a terrorist party "notwithstanding any other provision of law." 156 F.4th 632, 638 (D.C. Cir. 2025).

That is what happened here. Here, the Government seeks to forfeit the interests of the Democratic People's Republic of Korea ("North Korea") or its agencies or instrumentalities in a digital ledger balance of approximately 1.16 million Tether (USDT) that the United States alleges North Korea obtained by selling other crypto assets North Korea had taken by fraud from three international crypto exchanges. ECF No. 1, Complaint ¶¶ 15, 3. Claimants Han Kim and Yong Seok Kim, whose loved one was murdered by North Korea in an act of terrorism, who obtained a money judgment for compensatory damages for that loss, *Kim v. Democratic People's Republic of Korea ("North Korea")*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015), and who obtained a lien on North Korea's property interests with Tether International *S.A. de*

1

*C.V.* (the company that issues USDT), ECF No. 7–8, ¶¶ 52–56, filed verified claims and a combined Answer, ECF No. 22. The Kims contend that because of the Terrorism Risk Insurance Act their lien defeats the government's forfeiture and the property must be directed to the Kims. The Kims admit the facts of the Complaint and their verified claims establish the indisputable facts underlying their lien, and thus this case presents a pure issue of law ripe for decision. Judgment should issue for the Kims.

## II.   FACTS

The following facts are taken from the pleadings in this case or from existing judgments or other proceedings. Because the Kims admit the relevant facts of the Complaint, this Memorandum cites the Complaint only for the facts that appear there.

### A.   Background on Blockchain Technology and Tether

A blockchain is a system for a distributed network of machines to keep a ledger of transactions publicly and securely. Compl. ¶ 23. The blockchains at issue in this case are called Tron and Ethereum. *E.g.*, ¶ 44. Users participate in Tron or Ethereum using wallet addresses, which are digital representations of the sending and receiving ends of transactions on the blockchain. ¶ 20. Each time Tron or Ethereum validates a new block, it updates the state of its ledger to reflect information about each wallet address on the blockchain. ¶ 23. Tron can record transactions in many different assets. ¶ 17. This standard enables anyone on the Tron blockchain to create a "token" using something called a "smart contract." ¶ 25. A TRC-20 or ERC-20 token is

2

represented by a number representing a token balance associated with a wallet address that holds that balance. ¶ 23.

All standard tokens have some core functions—all of them have a fixed total supply at any time, may be transferred from one wallet address to another, and are fungible. But some TRC-20 tokens have additional functions encoded by their creators, including, for example, the ability for the creator to freeze the token balance of specific wallets so that they will always remain the same; to decrease the token balances of wallets; and to increase the token balances of wallets. ¶ 19.

A company called Tether issues a crypto asset called USDT. ¶ 19. To issue USDT, Tether uses its private keys to direct the smart contract code that it controls to cause a wallet address's USDT balance to equal the amount of USDT purchased. ¶ 19. Then, anyone with the private keys to *that* wallet address can transfer the USDT to any other wallet address. ¶ 21. Tether always retains the power to cause the USDT balance of any wallet address to remain frozen or to decrease to zero. ¶ 19. At any time, then, anyone who possesses one of two private keys can cause the USDT balance of a wallet address to decrease while simultaneously causing the USDT balance of another wallet address to increase: the person who holds the private keys to the decreasing (or sending) wallet address can do so, and Tether also always has this power as well because it holds the private keys to Tether's smart contract code. *See* ¶¶ 19, 21.

**B.      The Kims' Efforts to Recover For the Kidnapping, Torture, And Murder of Their Loved One**

In 1993, Reverend Dong Shik Kim moved from the U.S., where he was a lawful permanent resident, to China to work as a missionary providing humanitarian and religious services to North Korean families who had fled across the Sino–Korean border. *Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29, 36 (D.D.C. 2013). In 2000, Reverend Kim was abducted by a member of the North Korean security services and secreted across the border into North Korea. *Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1049 (D.C. Cir. 2014). No one outside North Korea has heard from Reverend Kim since. *Id.* Experts in North Korea's human-rights violations testified that North Korea sends those whom it deems to be "opponents of the . . . regime" to torture camps called *kwan-li-sos*. *Id.* at 1050. Experts further testified that Reverend Kim "suffered an untimely death" resulting "from torture and malnutrition . . . deliberately caused by his North Korean captors." *Id.* at 1050–51.

In 2009, the Kim family sued North Korea for the abduction and murder of Reverend Kim. *Kim v. Democratic People's Republic of Korea*, No. 09-CV-648, Dkt. 1 (D.D.C. April 8, 2009). North Korea, after being properly served, did not appear to defend. *Id.* Dkt. No. 12 (entry of default). And so the Kims sought a default judgment. *Id.* Dkt. No. 46. The district court denied that request, reasoning that the Kims had not presented evidence sufficient to meet the Foreign Sovereign Immunity Act's special provision for proof when a defendant defaults. *Kim*, 950 F. Supp. 2d at 34. The Kims appealed and the D.C. Circuit reversed, holding that "[t]he Kims . . . make a

4

compelling case that North Korea" tortured Reverend Kim and murdered him outside of the normal legal process. 774 F.3d at 1050. On remand, the district court entered a default money judgment of $15,000,000 in compensatory damages for each of the Kims and $300,000,000 in punitive damages to be divided between them. *Kim v. DPRK*, 87 F. Supp. 3d 286, 291 (D.D.C. April 9, 2015). The Kims served the default judgment on North Korea, and on July 23, 2019, the court granted the Kims permission to enforce the judgment under 28 U.S.C. § 1610(c). Since judgment issued, Claimant's compensatory damage award has accrued $411,796.10 of interest pursuant to 28 U.S.C. § 1961.

### C. North Korea Obtains Crypto Assets Through Fraud, Launders Them And Commingles Them With Assets From Other Sources, Then Sells Them For USDT

In July of 2023, hackers working for the North Korean government wrongfully obtained approximately $138 million worth of crypto assets from international crypto exchanges, Compl. ¶ 31, and in November of 2023 they obtained an additional $138 million from another exchange, *id.* ¶ 32. North Korean agents then traded these tokens for many other assets over a dizzying series of transactions in which they mixed the proceeds of the stolen assets from each exchange with the proceeds of the stolen assets from the other exchanges. *E.g. id.* ¶ 35. Eventually, the proceeds of the stolen assets ended up in the Target Addresses. *Id.* ¶ 13.

Tether froze the USDT balances of the Target Addresses in response to the government's request. *E.g. id.* at ¶ 44 n.9. On or about March 19, 2025, the FBI served a copy of the seizure warrant 25-sz-15 on Tether. *Id.* ¶ 13. That warrant is not publicly available to Claimants' knowledge. On or around March 19, 2025, Tether caused the

5

USDT balance of the Target Addresses to equal zero and the USDT balance of a wallet address belonging to the United States to equal the USDT balances that the target wallet addresses had before Tether decreased them to zero. *Id.* ¶ 53. The United States describes the March 19, 2025, transaction as "[transferring] to the United States the equivalent amount of USDT as was associated with [the] Target Addresses." *Id.* ¶ 53. Nothing about the March 19, 2025, transaction purported to, or did, extinguish any party's ownership interest in the Defendant Property.

### D.    The Kims Establish an Execution Lien on The Defendant Property

In 2025, the Kims registered their judgment against North Korea in the United States District Court for the Southern District of New York, *Kim v. Democratic People's Republic of Korea*, No. 25-MC-527 (S.D.N.Y. 2025). On December 10, 2025, the Clerk of the United States District Court for the Southern District of New York issued writs of execution in *Kim v. DPRK*, 25-CV-527. That day, the Kims, through counsel, personally served those writs on the United States Marshal for the Southern District of New York. ECF No. 8–9, ¶ 53. One of the writs "respectfully request[ed] that [the Marshal] execute this judgment by garnishing DPRK's assets, funds, or interests in the possession of Tether International, *S.A. de C.V..*" *Id.* ¶ 56.  The writ specifically requested that the Marshal

> [L]evy or seize all assets, funds, and property interests of any kind of the Democratic People's Republic of Korea or its agencies or instrumentalities, including but not limited to Tether Coins ("USDT"), digital wallet balances, any interest in Tether International S.A. de C.V., or its affiliates' cash, securities, or bonds, or other obligations and any other assets or interests held by, or for the benefit of, the Democratic People's Republic of Korea and its instrumentalities and agents.

*Id.* Under New York law, the service of this writ on the marshal created an execution lien in the Kims' favor. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991); *see also* David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 ST. JOHN'S L. REV. 43, 47–50 (2009) (explaining that New York law creates a lien on property as of the moment the judgment creditor delivers an execution to the executing officer).

### E.    This Proceeding

The Government filed the Complaint in this case on October 24, 2025, alleging that the Defendant Property, which is the "reissued USDT" that had previously been associated with the Target Addresses, ¶ 12, "is property constituting or derived from proceeds traceable to wire fraud, wire fraud conspiracy, money laundering, money laundering conspiracy, computer fraud and computer fraud conspiracy in violation of 18 U.S.C. §§ 1343, 1349, 1956, 1030, and 371." ¶ 56. The United States served notice by publication running until March 18, 2026, ECF No. 6, and the time within which to file verified claims expired on April 20, 2026. The Kims are the only claimants.

## III.    ARGUMENT

Much about this case is technologically complicated, but the legal issues as applied to the undisputed facts are straightforward: The Kims are entitled to the Defendant Property because Congress has explicitly prioritized their liens over the Government's forfeiture. As a result, the Government's claim to forfeiture should be dismissed and the property transferred to the Kims. If the Court dismisses the Government's claim, this Court retains jurisdiction to direct the property to the Kims. *United States v. 475 Martin Lane*, 545 F.3d 1134, 1146 (9th Cir. 2008).

### A.   Legal Standards For Judgment on The Pleadings And Summary Judgment in Forfeiture Cases

In this case, the Government sues the Defendant Property *in rem* alleging that it is forfeitable as the proceeds of crime. Compl. ¶ 12. In response, Claimants have each filed verified claims contending that they have protected interests in the Defendant Property, ECF No. 7–8, and answers to the Complaint admitting the facts, ECF No. 9. In a forfeiture action, a claimant must first establish standing by pleading "a colorable interest in the property, for example, by [alleging] actual possession, control, title, or financial stake." *United States v. 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir. 2008) (citation and internal quotation marks omitted); *see also United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1275 (10th Cir. 2008); *United States v. One Lincoln Navigator*, 328 F.3d 1011, 1013 (8th Cir. 2003). The Kims easily meet that bar. *See, e.g., United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 620 (7th Cir. 2015) (holding that TRIA provides post-seizure lienholders with standing in civil-forfeiture cases).

Rule 12(c) of the Federal Rules of Civil Procedure, which applies in civil forfeiture cases because it is not inconsistent with Supplemental Rule G, states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." *United States v. All Assets Held at Bank Julius Baer & Co.*, 772 F. Supp. 2d 205, 208 (D.D.C. 2011) (quoting Fed. R. Civ. P. 12(c)). The standard of review for motions for judgment on the pleadings is essentially the same as that for motions to dismiss under Rule 12(b)(6), *id.*, and, as with a motion to dismiss, "the Court may not rely on facts 'outside' the pleadings in deciding a motion

8

for judgment on the pleadings," *id.*, but the "Court may consider . . . documents 'upon which [a party's pleading] necessarily relies,' even if those documents are not physically attached to the filed pleading," *id.* (quoting *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009)).

###   B.   The Kims' Claim Is Superior to The Government's Under *Levin II*

The Kims' claim defeats the Government's attempt to forfeit the Defendant Property because the Kims hold a lien on that property stemming from a terrorism-related judgment, because that property is covered by TRIA, and because terrorism-related liens on property covered by TRIA defeat the government's forfeiture. It is possible, as explained below, that the mere existence of the Kims' terrorism-related *judgment* is alone sufficient to defeat the government's forfeiture, but this Court need not decide that question because of the Kims' valid and enforceable lien.

####   *1.   The Kims hold a lien on the Defendant Property*

In a civil forfeiture case, like this one, governed by 18 U.S.C. § 981, the nature of a claimant's asserted property interest in defendant assets is "defined by the law of the State in which the interest arose." *One Lincoln Navigator*, 328 F.3d at 1013; *see also United States v. $100,348 U.S. Currency*, 354 F.3d 1110, 1119 (9th Cir. 2004); *United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233 ("One-Sixth Share")*, 326 F.3d 36, 45 (1st Cir. 2003). Here, that state is New York, where Tether maintains the treasury assets "backing" USDT. ECF No. 8–9 ¶ 18, 23.

9

Under New York law, "those property interests of the judgment debtor 'which by law the debtor may assign or transfer, may be sought for application to the judgment.'" *All. Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 24 (2nd Cir. 1999) (citing *New York Practice*, *supra*, § 486, at 742); *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674 (1976)). Where those interests are capable of being turned over by a third party—called a "garnishee"—who holds them on the judgment debtor's behalf, the judgment creditor's process begins by serving a writ of execution on the executing officer (in this case the U.S. Marshal), which establishes a lien over the judgment debtors' property. *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 533 (2d Cir. 1991) ("Under New York law, a judgment creditor becomes a 'judgment lien creditor' as to personal property . . . after execution is delivered to the sheriff."). The executing officer then "levies" the property by serving the writ of execution on the garnishee. *E.g.*, David Gray Carlson, *Critique of the Money Judgment (Part II Liens on Personal Property)*, 83 ST. JOHN'S L. REV. 43, 47–50 (2009). Where, as here, the property is intangible (known in Article 52 as "property not capable of delivery"), the executing officer's levy is known as a "paper levy"; a further order of turnover from a court is usually necessary to transfer the judgment debtors' interest from the garnishee to the judgment creditor. *Id.*

On December 10, 2025, the Kims served a writ of execution on the U.S. Marshal, who executes judgments registered in federal court, directed to all property interests belonging to North Korea that Tether is capable of turning over. ECF No. 8–9 ¶ 2. The Kims have moved for an order directing the Marshal to serve Tether in

El Salvador, *Kim*, No. 25-MC-527, ECF No. 13, and, once that is accomplished, will conduct discovery and seek turnover of North Korea's assets, *e.g. id.* ECF No. 4-1 (seeking turnover of North Korean assets from another stablecoin issuer). Thus, on December 10, 2025, the Kims perfected an execution lien on all property interests owned by North Korea that Tether is capable of turning over—namely all USDT owned by North Korea.

The Defendant Property is USDT owned by North Korea and, therefore, the Kims have a valid execution lien on it. Stablecoin balances like the Defendant Property are a form of intangible property, and so they can be possessed by more than one person at the same time. *See, e.g.*, *Timoria LLC v. Anis*, 346 A.3d 1166, 1180 (Del. Ch. 2025) (discussing situs of crypto assets); *Office Depot, Inc. v. Zuccarini*, 596 F.3d 696, 703 (9th Cir. 2010) (explaining that domain names, which, like USDT, can be transferred by owners, custodians, and issuers are sited for relevant purposes by all three). When the Government "seized" the Defendant Property by compelling Tether to "transfer[] to the United States the equivalent amount of USDT as was associated with the Target Addresses," the Government obtained possession of the USDT alongside Tether (who can always transfer USDT, as explained above). But the Government did not, and could not have, obtained *ownership* of the USDT balances; that, after all, is what the forfeiture process exists to determine in the first place. *E.g.*, *Est. of Levin v. Wells Fargo Bank, N.A. ("Levin I")*, 45 F.4th 416, 419 (D.C. Cir. 2022) (explaining that judgment debtor retained property interest in funds during pendency of government's forfeiture action). Right now, then, the Defendant Property

11

is a USDT balance owned by North Korea in a wallet address to which the Government has the private keys. ¶ 73. It is, therefore, subject to the Kims' execution lien on Tether as garnishee under New York law.

Jurisdiction in a New York turnover action like the one the Kims are pursuing against Tether is *in personam*, not *in rem*. In *Koehler v. Bank of Bermuda Limited*, the Court of Appeals held that a turnover action is valid where personal jurisdiction exists over the garnishee even where the property that the judgment creditors seek is located abroad. 12 N.Y.3d 533, 537 (2009). Crucially, then, there is no problem with the prior-exclusive-jurisdiction doctrine which, as the D.C. Circuit explained in *Levin II*, prevents two courts from hearing *in rem* actions regarding the same *res*. 156 F.4th at 640. The Kims established a lien over all North Korean property interests, wherever they may be located, that Tether controls, asserting personal jurisdiction over Tether because the Kims' turnover action arises out of Tether's possession of reserve assets in New York. *See, e.g.*, *Peterson v. Bank Markazi*, 121 F.4th 983, 990–92 (2d Cir. 2024) (holding that Article 52 creates cause of action for turnover and that the cause of action creates specific personal jurisdiction in New York to seek the turnover of intangible property representing rights to assets in New York).

> 2.    *The Defendant Property is "the blocked asset[] of [a] terrorist party" subject to a terrorism-related judgment and so, under* Levin II, *the Kims' claim defeats the Government's*

Under D.C. Circuit law, a lien to execute a terrorism-related judgment against the blocked assets of a state sponsor of terrorism prevails over the government's forfeiture claims to the same assets because of the TRIA. *Levin II*, 156 F.4th at 638. Here, the Defendant Property are blocked assets of a terrorist party and the Kims'

12

judgment is for an act of terrorism, and so the Kims' execution lien takes priority over the Government's forfeiture.

Section 201 of the TRIA provides in relevant part that

> Notwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* (quoting Terrorism Risk Insurance Act of 2002, Pub. L. 107-297, 116 Stat. 2322). The "TRIA defines a 'blocked asset' as 'any asset seized or frozen by the United States' under [the International Emergency Economic Powers Act ('IEEPA'), but it excludes from the definition assets that are subject to certain licenses or used exclusively for diplomatic purposes." *Id.* (quoting TRIA § 201(d)(2)(A)–(B)). The TRIA "defines a 'terrorist party' to include any foreign country designated as a state sponsor of terrorism. *Id.* (quoting TRIA § 201(d)(4)). And a terrorism-related judgment includes "any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section . . . 28 U.S.C. § 1605A." 28 U.S.C. § 1610. The USDT at issue meets this definition.

*First*, the Defendant Property are "the blocked assets" of a terrorist party because "when property of designated persons comes 'within the United States' or 'the possession or control of U.S. persons,' it is 'blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in.'" *Levin II*, 156 F.4th at 638 (quoting

13

31 C.F.R. § 594.201(a)). Here, as explained below (*infra* Section III.D.1) the Defendant Property is currently owned by North Korea or its agencies or instrumentalities. *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 930 (6th Cir. 2000) ("[I]f a thief steals funds and uses them to purchase other property the owner cannot follow the funds, and he is left to his remedy against the thief, who, although he had no title to the stolen funds, *does have title to the property purchased therewith*.") (emphasis added). North Korea (and its agencies and instrumentalities, such as the "Lazarus Group" or "APT-38") are "designated persons" under IEEPA. *See, e.g.*, OFFICE OF FOREIGN ASSET CONTROL (OFAC), SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST at 1452 (Oct. 2025). And the property is both "within the United States" and in "the possession or control of [a] U.S. person." ECF No. 1 ¶ 54 ("The Defendant Property is currently in the possession of the USMS."); *see also Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107, 137 (2d Cir. 2016) ("[A]ll assets belonging to an entity that satisfies [the] definition of [a terrorist party under an executive order] are automatically blocked."). It is therefore "frozen" by IEEPA and constitutes "blocked" property under TRIA.

The record does not currently show whether Tether, the FBI, or the USMS received an OFAC license authorizing either the transfer of the Defendant Property from Tether or from the FBI, by whom it was originally seized, to the USMS. *See generally id.* Federal law generally requires even the Government to get such a license. *Levin II*, 156 F.4th at 637. But regardless the Government does not plead

that it has a license, and even if it did the "license exception [to TRIA] does not apply because the license itself was required by IEEPA." *Id.* at 638.

*Second*, the Kims hold a judgment for an act of terrorism against a terrorist party. North Korea is a designated state sponsor of terrorism. U.S. DEPARTMENT OF STATE, STATE SPONSORS OF TERRORISM at 1. And the Kims' judgment is for an act— the torture and murder of their loved one—for which North Korea would not be immune under 28 U.S.C. § 1605A. *Kim*, 774 F.3d at 1045.

Therefore, under *Levin II*'s binding interpretation of TRIA, the Kims' lien defeats the government's claim to forfeit the Defendant Property. In *Levin II*, the Court held that because property covered by TRIA "shall be subject to execution" of judgments covered by TRIA "notwithstanding any other provision of law," including the federal code provisions that make the proceeds of crime forfeitable, judgment creditors holding covered judgments who execute on blocked property that is also subject to forfeiture prevail. *Id.* The Kims have executed on the Defendant Property by serving a writ of execution, which, under applicable law, created an enforceable lien on the Defendant Property. *See supra* Section III.B.1. This Court should, therefore, grant judgment on the pleadings and dismiss the Government's claim to forfeiture because, accepting the facts of the Complaint as true—which all three Answers do—the Government may not lawfully forfeit the assets.

To be clear, nothing about the relief that the Kims request would require issuing a writ of execution *to the USMS*; the Kims have already executed against the Defendant Property by serving a writ of execution on Tether, who possesses the

15

capacity to transfer the Defendant Property and, therefore, is a proper garnishee—as explained above, a USDT balance is intangible personal property and may be possessed by more than one person at the same time. *Supra* Section III.B.1. In *Greenbaum v. Islamic Republic of Iran*, the D.C. Circuit held that despite TRIA the doctrine of sovereign immunity forbids the service of a writ of execution on the Marshal him- or herself because such a writ effectively makes the Government a defendant in a civil action without its consent. 67 F.4th 428, 431 (D.C. Cir. 2023). That concern does not apply here because the Government is the *plaintiff*, and the Kims seek a dismissal of the government's claims. *Contra id.* ("[T]he writs name the U.S. Attorney's Office as garnishee, requiring it to appear in the execution proceedings and answer interrogatories under compulsion of a 'judgment of condemnation.'").[1]

### C. This Court Retains Jurisdiction to Direct The Defendant Property to The Kims After Dismissing The Government's Claim

This Court should, as explained above, grant judgment to the Kims against the Government's forfeiture claim and, therefore, dismiss that action. If the Court does so, though, it will retain jurisdiction over the disposition of the Defendant Property

---

[1] On remand in *Greenbaum*, the claimants argue that their TRIA-protected *judgments* are alone sufficient to defeat the Government's claim to forfeiture even though they were unable to execute against defendant property that was exclusively in the custody of the USMS. ECF No. 67 at 8–14, *Greenbaum v. Islamic Republic of Iran*, No. 21-CV-305 (D.D.C., Nov. 1, 2024). This Court need not consider this question because the Kims have already perfected an execution lien on the Defendant Property, as the claimants in *Levin II* did. But, to the extent the Court wishes to reach this argument, the Kims incorporate the *Greenbaum* claimants' argument by reference here and will expand on that argument at the Court's request.

and can, therefore, direct it to the Kims. In *United States v. 475 Martin Lane*, the Ninth Circuit squarely held that because an *in rem* action is an action against all the world's interests in the defendant property, a court that obtains *in rem* jurisdiction by seizure of the defendant property retains jurisdiction to consider how it should be disposed even after dismissing the Government's complaint. 545 F.3d 1134, 1146 (9th Cir. 2008). That is true even where, as here, the claimants could file separate suits to recover the Defendant Property. *Id.* Although the D.C. Circuit does not appear to have decided this exact question, no other circuit has disagreed with the Ninth Circuit's persuasive analysis, which relies in part on *United States v. Wilson*, an analogous case from the criminal forfeiture context, which *475 Martin Lane* quotes as "noting, in the context of a Fed. R. Crim. P. 41(e) hearing regarding disposition of seized property, that the fact that adequate civil remedies exist 'neither discharges the district court's duties nor disturbs its jurisdiction.'" *475 Martin Lane*, 545 F.3d at 1146 (quoting *United States v. Wilson*, 540 F.2d 1100, 1104 (D.C. Cir. 1976)).

## IV.    CONCLUSION

For the foregoing reasons, this Court should dismiss the Government's claim in forfeiture and retain jurisdiction to direct the Defendant Property to the Kims.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
GERSTEIN HARROW LLP
1629 Columbia Road NW, Suite 302
Washington, DC 20004
charlie@gerstein-harrow.com
(202) 670-4809

17

*/s/ Jason Harrow*
Jason Harrow
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*/s/ Robert Tolchin*
Robert Tolchin
THE BERKMAN LAW OFFICE LLC
829 E. 15th Street, Suite Seven
Brooklyn, New York 11230
rtolchin@berkmanlaw.com
(718) 855-3627

*Attorneys for Claimants Han Kim and Yong Seok Kim*

18